United States District Court
Southern District of Texas
**ENTERED**
August 28, 2018
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Maite Marshall and Dylan Marshall, | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | NO. 4:16-CV-1881 |
| | § | |
| Sergeant Ben Russell and Harris County, | § | |
| | § | |
| *Defendants.* | § | |

## REPORT AND RECOMMENDATION
## ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Before the Court are Defendant Ben Russell's Amended Motion for Summary Judgment, ECF No. 55,[1] and Defendant Harris County's Motion for Summary Judgment, ECF No. 53.[2] Having considered the filings and the record, which contain both factual evidence and applicable legal authorities, the Court recommends that Defendant Ben Russell's motion should be granted in part and denied in part, and Defendant Harris County's motion should be granted.[3]

---

[1] Plaintiff filed a response, ECF No. 57, and Defendant Russell filed a reply, ECF No. 59.

[2] Plaintiff filed a response, ECF No. 56, and Defendant Harris County filed a reply, ECF No. 58.

[3] On April 23, 2018, the district judge referred this case for all pretrial purposes pursuant to 28 U.S.C. § 636. Order, ECF No. 60. Pursuant to 28 U.S.C. § 636(b)(1)(A), a motion for summary judgment is a dispositive motion appropriate for a Report and Recommendation.

# I.
## FACTUAL OVERVIEW

Plaintiffs Maite Marshall and Dylan Marshall ("Plaintiffs") filed this suit against Defendants Sergeant Ben Russell ("Sgt. Russell") and Harris County ("County") (collectively "Defendants") on June 28, 2016. ECF No. 1. This civil rights suit arises out of the shooting death of Charles Marshall ("Mr. Marshall" or "Decedent") on June 21, 2015. Maite Marshall is the Decedent's wife, and Dylan Marshall is Decedent's and Maite Marshall's son. The operative complaint, Plaintiffs' Third Amended Complaint, alleges the following causes of action under federal and state law:

1. Excessive Force under the Fourth Amendment (42 U.S.C. § 1983) against Sgt. Russell;

2. Deliberate indifference to Decedent's medical needs against Sgt. Russell;[4]

3. Negligence and bystander claims against Sgt. Russell;

4. *Monell* claim (42 U.S.C. § 1983) against Harris County;

5. Negligence against Harris County.

Ex. 1, ECF No. 52-1.

Most of the facts are undisputed, except for some details in the moments leading up to the shooting. Construing the record in the light most favorable to

---

[4] Plaintiffs combined the claims for excessive force and deliberate indifference to Decedent's medical needs under Count I in their Third Amended Complaint, but the Court separates them here because a different analysis applies to each.

Plaintiffs, as the Court must on a motion for summary judgment, the following are the pertinent facts in evidence:

### A. Facts Leading Up To The Shooting.

Mr. Marshall had a history of depression and bipolar disorder and was previously hospitalized for one or both of those conditions. D. Marshall Dep. 7:18-8:6, ECF No. 52-5; M. Marshall Dep. 9:6-25, 10:5-24, ECF No. 52-6. This incident occurred on June 21, 2015, at Mr. Marshall's apartment in Houston, Texas. D. Marshall Dep. 9:2-7, ECF No. 52-5; Russell Aff. ¶ 5, ECF No. 52-2. Dylan Marshall was at home with his father. D. Marshall Dep. 9:2-7, 12:2-16, ECF No. 52-5. When Mr. Marshall arrived home, he was under the influence of alcohol, sad, and depressed. *Id.* 12:2-13. Dylan and his father were having a verbal argument. *Id.* 12:19-13:23. Dylan called his mother to help alleviate his father's intoxicated and depressed state. *Id.* 12:2-18.

Mr. Marshall cut his wrist with a razor and was bleeding. *Id.* 6:3-7:17. After Mrs. Marshall arrived at the apartment, she called 911 to request an ambulance at 4:17 p.m. M. Marshall Dep. 9:1-6, ECF No. 57-6; Coons Aff. ¶ 6, ECF No. 52-3. While Mrs. Marshall only called 911 to request an ambulance, M. Marshall Dep. 9:1-6, ECF No. 57-6, and did not request law enforcement, "ambulance dispatchers routinely request police officers to first stabilize scenes such as this

prior to entry by the crew and, second, to maintain security while the crew performs their task," Coons Aff. ¶ 25, ECF No. 52-3.

At 4:24 p.m., after speaking with Mrs. Marshall, the dispatcher entered the following text into Call Slip #SA150621170:

> CREP ADV HER 49 YO HUSBAND SLIT HIS WRISTS AND IS BLEEDING / NOT A SUICIDE ATTEMPT / REP IS ARGUING WITH HER HUSBAND .. UNK CLOTHING DESC / CYPRESS CREEK EMS ENRT / EMS REQ SO / EMS ADV WILL STAGE / ADV HUSBAND IS INTOX .. ADV HUSBAND IS VIOLENT / NO WEAPONS

*Id*. ¶ 6. The Cypress Creek Ambulance Service also called the Harris County Sheriff's Office ("HCSO") at 4:22 p.m. requesting a deputy to support them. *Id*. This HCSO call slip, #SA150621171, advised:

> EMS STAGED // REQ. S.O. TO CHECK BY FOR POSS DISTB // ADV ML WAS INTOX AND DIDN'T WANT TO ANSWER ANY MORE QUESTIONS

*Id*. Call slip #SA150621171 was combined with Call Slip #150621170 at 4:24 p.m., and was broadcast to patrol units two minutes later at 4:26 p.m. *Id*. Sgt. Russell responded to the call at 4:26 p.m., and arrived alone at the apartment at 4:29 p.m. *Id*.

Upon arriving, Sgt. Russell saw Mrs. Marshall on the second floor landing, outside the apartment. Russell Aff. ¶ 7, ECF No. 52-2. Sgt. Russell walked up the stairs and asked Mrs. Marshall what was going on. *Id*. She spoke with the officer briefly. *Id*.; M. Marshall Dep. 12:5-13:24, ECF No. 57-6.

**B. The Shooting.**

Sgt. Russell moved to the middle of the second floor landing outside the apartment doorway, where he could see into the apartment. Russell Aff. ¶ 7, ECF No. 52-2. Mr. Marshall was standing with no shirt on, visibly bleeding from his left wrist, and holding a cordless drill. *Id*. Mr. Marshall initially did not appear to realize Sgt. Russell was present and focused his attention on Mrs. Marshall. *Id*. ¶ 8. Mr. Marshall turned toward the wall to his left and appeared to press the drill against his left wrist. *Id*.; M. Marshall Dep. 13:5-14:13, ECF No. 57-6. The parties dispute whether the drill had a drill bit on it, and likewise dispute whether the drill caused any injury to Mr. Marshall or penetrated his skin. Russell Aff. ¶¶ 8-10, ECF No. 52-2; M. Marshall Dep. at 13:5-15:13, ECF No. 57-6. Sgt. Russell removed his firearm from his holster and ordered Mr. Marshall to put down the drill. Russell Aff. ¶ 10, ECF No. 52-2; M. Marshall Dep. 13:2-14:20, ECF No. 57-6. Mr. Marshall asked whether Sgt. Russell was going to kill him. Russell Aff. ¶ 10, ECF No. 52-2; M. Marshall Dep. 14:14-16, ECF No. 57-6. Sgt. Russell then fired one shot into Mr. Marshall's chest, causing Mr. Marshall to fall to his side. Russell Aff. ¶ 10, ECF No. 52-2; M. Marshall Dep. 14:17-20, ECF No. 57-6. One minute and fifty seconds (01:50) after Sgt. Russell arrived on scene, at 4:31:36 p.m., Call Slip #SA150621170 indicated shots had been fired. Coons Aff. ¶ 6, ECF No. 52-3.

Fifty-one seconds (00:51) later, at 4:32:00 p.m., Sgt. Russell radioed for the ambulance to "move up" and come to the scene of the shooting. *Id*. Paramedics arrived on scene at 4:37 p.m. Zwickey Aff. at 11, ECF No. 52-4. They pronounced Mr. Marshall deceased at 4:38 p.m. *Id*. It is undisputed the gunshot wound caused Mr. Marshall's death. *Id*. at 12; M. Marshall Dep. 14:17-22, ECF No. 57-6.

During the time Sgt. Russell was on scene and leading up to the shooting, Dylan Marshall was in the bathroom taking a shower. D. Marshall Dep. 9:2-11, ECF No. 52-5. Before Dylan heard the gunshot, he heard his mother say "in a loud voice," "Charlie, just please put down the drill," and then he heard the gunshot. *Id*. 9:12-10:8.

The parties dispute various details in the moments leading up to the shooting. They dispute what Mrs. Marshall said to Sgt. Russell when he arrived. Mrs. Marshall testified that she told the officer "I'm waiting for the ambulance because my husband needs medical attention because he's bleeding from his left arm." M. Marshall Dep. 12:23-13:24, ECF No. 57-6. The officer allegedly asked if Mr. Marshall was being bothersome, and Mrs. Marshall testified she said "No." *Id*. Mrs. Marshall also testified she told Sgt. Russell that Mr. Marshall was drunk. *Id*. 11:20-22. The parties dispute where Mr. Marshall was standing throughout the encounter and whether he made a threatening movement toward Sgt. Russell. Mrs. Marshall testified that after Sgt. Russell climbed the stairs to the second floor

6

landing outside of the apartment, Mr. Marshall was standing inside the doorway, and Mrs. Marshall stood in between Sgt. Russell and Mr. Marshall by the side of the landing. *Id*. 15:3-16:18. Plaintiffs claimed Mr. Marshall never moved from this position, never made any threatening movement toward Sgt. Russell, and did not present any danger to anyone. Mrs. Marshall's testimony supports these assertions. *Id*. 14:11-25, 15:1-16:8. She testified that just before Mr. Marshall was shot, he said "Well, what are you going to do? You going to kill me?" *Id*. 14. She further testified Sgt. Russell shot Mr. Marshall suddenly and for no reason. *Id*. Mrs. Marshall testified that after the shooting she and her son were directed to clear the scene, and then Sgt. Russell returned to the apartment alone, tampered with evidence, took a drill bit from the drill case on the kitchen counter, and attached the drill bit to the drill. *Id*. 4:3-7:6, 5:23-6:11.

Sgt. Russell stated after he climbed the stairs to the second floor landing outside of the apartment, Mrs. Marshall was on the landing pointing at a person in the apartment and yelling to get Mr. Marshall out of the apartment. Russell Aff. ¶ 7, ECF No. 52-2. Sgt. Russell stated, when he approached the apartment, he was standing about three feet from the doorway on the landing, and Mr. Marshall was standing approximately four feet inside the apartment. *Id*. ¶¶ 7-8. Seeing Mr. Marshall press the drill against his arm caused Sgt. Russell to fear for his own safety and Mrs. Marshall's safety. *Id*. ¶ 10. Sgt. Russell stated Mr. Marshall looked

7

at the gun and said, "What, are you going to f***ing shoot me?" *Id*. Sgt. Russell stated Mr. Marshall then raised the drill and moved quickly toward him. *Id*. Sgt. Russell allegedly believed he was in immediate danger of death or serious bodily injury and fired his gun. *Id.* Sgt. Russell stated at the time he fired, Mr. Marshall was at the doorway approximately three feet away from him; in other words, Mr. Marshall advanced four feet toward him. *Id*. After Plaintiffs were escorted away from the scene, Sgt. Russell stated he went back into the apartment to ensure no other persons were inside and to secure the scene. *Id*. ¶ 13.

### C. Sergeant Russell's Disciplinary History.

In 2006, Sgt. Russell was disciplined, suspended for five days, and placed on probation for six months for making a racial slur toward a fellow deputy and lying about it to the Internal Affairs division under oath. Ex. G, ECF No. 57-7. During the internal affairs investigation of the incident, Sgt. Russell lied about making the statement, subsequently failed a polygraph examination, and only then admitted to making the statement. Ex. G at 7-10, ECF No. 57-7. Sgt. Russell did not dispute this. Russell Aff. ¶ 19, ECF No. 52-2. In a subsequent employee evaluation dated July 6, 2007, Sgt. Russell's supervisor did not address the disciplinary action and instead gave Sgt. Russell positive feedback. Ex. I at 3, ECF No. 57-9. Sgt. Russell was also later promoted from Deputy to Sergeant. ECF No. 57 at 5.

## II.
## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides for the entry of summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to its case and on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curtis v. Anthony,* 710 F.3d 587, 594 (5th Cir. 2013); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

"Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the nonmovant will be unable to establish a genuine dispute of material fact." *Stewart v. U.S. Bank Nat. Ass'n*, 107 F. Supp. 3d 705, 707 (S.D. Tex. 2015). "The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *Id.* "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks and citation omitted).

"This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th

Cir. 2005) (quoting *Little*, 37 F.3d at 1075). "'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial,' and summary judgment as a matter of law must be granted." *Brown v. United States Postal Inspection Serv.*, 206 F. Supp. 3d 1234, 1242 (S.D. Tex. 2016) (quoting *Celotex*, 477 U.S. at 322–23). However, the court must draw all reasonable inferences in the light most favorable to the non-moving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).

## III.
## DEFENDANT BEN RUSSELL'S MOTION FOR SUMMARY JUDGMENT

### A. Qualified Immunity For Excessive Force Under The Fourth Amendment.

Sgt. Russell brought a motion for summary judgment in both his individual and official capacities. As to Plaintiffs' Fourth Amendment claim of excessive force, Sgt. Russell alleged he is entitled to qualified immunity because he did not violate any clearly established constitutional right. ECF No. 55 at 32-34. Sgt. Russell alleged that his conduct under the circumstances was not unreasonable because when Mr. Marshall made a quick, threatening movement toward Sgt. Russell with the drill in hand, Sgt. Russell reasonably believed he and Mrs. Marshall were in immediate danger. ECF No. 55 at 12-13, 28-30. Plaintiffs claimed that disputed material facts preclude granting summary judgment and

qualified immunity, and that Sgt. Russell's conduct was objectively unreasonable because Mr. Marshall did not present a threat to anyone. ECF No. 57 at 2, 10.

### 1. Qualified immunity.

Qualified immunity protects officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Echols v. Gardiner*, No. 11-882, 2013 WL 6243736, at *17 (S.D. Tex. Dec. 3, 2013) (citations omitted). The officer need only in good faith plead that he is entitled to qualified immunity, and need not put forth any evidence. *Id*. Once a defendant asserts qualified immunity, "the burden shifts to the Plaintiff to rebut it." *Id.* (quoting *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir. 2003)).

To determine whether an officer is entitled to qualified immunity, courts undertake a two-prong inquiry: (1) whether the facts alleged, taken in the light most favorable to the non-moving party, show the officer's conduct violated a constitutional right, and (2) whether the defendant's actions were objectively reasonable in light of the law that was clearly established at that time. *Id*.; *accord Trammell*, 868 F.3d at 339 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

11

Courts have discretion to evaluate these prongs in either order as appropriate under the circumstances of each case. *Trammell*, 868 F.3d at 339 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "Qualified immunity is a question of law, but where there are genuine disputes of material fact relevant to immunity, the jury decides the question." *Velasquez v. Audirsch*, 574 F. App'x 476, 479 (5th Cir. 2014) (citing *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008)); *Echols*, 2013 WL 6243736, at *17 (summary judgment is inappropriate when underlying historical facts as to reasonableness are in dispute). Sgt. Russell is entitled to qualified immunity if under Plaintiffs' version of events his use of force was not "clearly excessive or clearly unreasonable." *Reyes v. Bridgwater*, 362 F. App'x 403, 406 (5th Cir. 2010).

### a. *Plaintiffs have alleged a violation of a clearly established constitutional right.*

Plaintiffs alleged that Sgt. Russell used excessive force against the Decedent in violation of his constitutional rights under the Fourth Amendment. ECF No. 57 at 8-12. Sgt. Russell asserted that even if he violated a clearly established right, he is entitled to qualified immunity because his actions were "objectively reasonable" in light of the circumstances. ECF No. 55 at 23. To prove a Fourth Amendment violation, Plaintiffs must show: (1) an injury (2) which resulted from the use of force (3) that was objectively unreasonable. *Trammell*, 868 F.3d at 340. "Unlike some areas of constitutional law, the question of when deadly force is

12

appropriate—and the concomitant conclusion that deadly force is or is not excessive—is well-established." *Reyes*, 362 F. App'x at 406 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)).

Here it is undisputed that Sgt. Russell fired his gun, it struck Mr. Marshall, and it caused Mr. Marshall's death. Defendant disputed that a constitutional violation occurred. ECF No. 55 at 28, 32. Under Plaintiffs' version of the facts, Mr. Marshall did not pose any threat to anyone. He was standing in his apartment, holding a drill without a drill bit, and waiting for medical aid to arrive as he was bleeding. He did not advance or make any threatening movement toward anyone. Under this version of the facts, it was clearly established that Sgt. Russell's shooting violated the Fourth Amendment.

### b.  *Plaintiffs established a fact issue as to whether Sgt. Russell's acts were objectively reasonable.*

Determining whether use of force is objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Trammell*, 868 F.3d at 340 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. "The calculus of reasonableness

must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving….” *Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (quoting *Graham*, 490 U.S. at 396-97). Deadly force is not justified unless the person poses a significant threat of harm to the officers or others at that time. *Reyes*, 362 F. App’x at 406 (citing *Garner*, 471 U.S. at 1); *accord Boston v. Harris Cnty.*, No. H-11-1566, 2014 WL 1275921, at *5 (S.D. Tex. Mar. 26, 2014) (citing *Flores v. City of Palacios*, 381 F.3d 291, 399 (5th Cir. 2004)).

Applying the *Graham* factors and drawing all factual inferences in the non-moving parties’ favor, Plaintiffs have presented facts sufficient to raise a genuine dispute of material fact as to whether Sgt. Russell acted unreasonably and violated Mr. Marshall’s right to be free from unreasonable deadly force. It is undisputed that Sgt. Russell was not responding to any crime; he was responding to a call for medical assistance to ensure Emergency Medical Services (“EMS”) could render medical aid. Mrs. Marshall testified that when Sgt. Russell arrived on scene, she informed him she was “waiting for the ambulance because [her] husband need[ed] medical attention because he [wa]s bleeding from his left arm,” and responded “No” when Sgt. Russell asked if Mr. Marshall was being bothersome. M. Marshall Dep. 12:23-13:24, ECF No. 57-6. Mrs. Marshall also testified she told Sgt. Russell that Mr. Marshall was drunk. *Id.* 11:20-22.

14

In this case, the critical inquiry is whether the shooting was objectively reasonable in the circumstances confronting Sgt. Russell at the moment he shot Mr. Marshall. The most critical disputed fact is whether, at the moment Sgt. Russell shot Mr. Marshall, Mr. Marshall took steps toward Sgt. Russell or made some other threatening movement toward Sgt. Russell.

In his affidavit, Sgt. Russell stated that when he climbed the second floor landing of the apartment building, he "moved to the middle of the second floor landing about three feet from the doorway, where [he] could see inside the apartment…." Russell Aff. ¶ 7, ECF No. 52-2. He further asserted Mr. Marshall was "approximately four feet inside the apartment." *Id*. ¶ 8. Sgt. Russell stated:

> After seeing the male bleeding and appearing to use the drill to cause additional harm to himself I was alarmed and afraid that he was going to harm either me or the female standing nearby with the drill. Fearing for the safety of the female and myself, I immediately went to low ready with my service weapon in my hand pointed toward the ground. I ordered the male to drop the drill at least two times then the male turned towards me and I talked to him and tried to get him to come with me for medical care. The male looked directly at my handgun and stated, "What, are you going to f***ing shoot me?" The male raised the drill and moved quickly towards me. I reflexively raised my weapon and fired one shot into the male's chest because I believed he was going to hurt me or kill me with the drill. At the time I fired, the male was at the doorway and about three feet from me. After the shot, the male turned and fell on his side inside the apartment.

*Id*. ¶ 10. Sgt. Russell contended Mrs. Marshall did not see Mr. Marshall advance toward Sgt. Russell because she was looking at Sgt. Russell at the time he fired his

weapon. ECF No. 55 at 29-30. He attached the following excerpts from her

deposition transcript:

> Q:   So is it accurate – from all the words that you've said, my
>       understanding is that you were looking at Sergeant Russell –
> A:    Uh-huh.
> Q:   -- at the time that he pulled his weapon and fired?
> A:   Right, right. That's correct.
> Q:    You were not looking at Charlie at the time?
> A:   No. I looked at Charlie whenever he got shot.
> Q:   But after he got shot, of course, you looked at Charlie?
> A:   Right. There you go.

M. Marshall Dep. 11:5-12:24, ECF No. 52-6.

However, Mrs. Marshall testified that Mr. Marshall was undergoing a mental

health crisis, was not violent, never moved from his position,[5] did not do anything

to threaten anyone, and did not harm anyone other than himself. Specifically, she

stated the following:

> Q:   And is there anything in the first paragraph that you believe is
>       incorrect and that you did not say?
> A:   Yes. He was – he was not violent.
> Q:   Okay. Now –
> A:   He was just – he was just drunk and were – and, you know, he just –
>       you know, arguing but not – not violent.
> Q:   Okay.
> A:   To me violent is like a physical violent person. He was not. He was
>       just drunk.

---

[5] It is not clear from the record exactly how far away Mr. Marshall was from Sgt. Russell at any given time. Defendant stated Mr. Marshall was initially approximately seven feet away from him, Russell Aff. ¶¶ 7-8, ECF No. 52-2, but Defendant's non-retained expert alleges Mr. Marshall was approximately 11 feet away, Coons Aff. ¶ 26(C), ECF No. 52-3. Mrs. Marshall testified Mr. Marshall was inside the doorway, but does not state exactly how many feet. M. Marshall Dep. 15:3-16:11, ECF No. 57-6.

> Q:     Okay. What would you – how would you describe the action of someone cutting themselves with a razor?
>
> A:     He was just crying for help. He's bipolar. He's done that before. He – he's been suffering that for many years.

M. Marshall Dep. 9:11-25, ECF No. 57-6.

> A:     … Charlie still had the driller on his arm just playing with it with no bit. It was just the plastic little thing. He was just numbing, like was – like he was just intoxicated, just having – like, you know, playing with it. I – I don't know what other word to say. He was not harming anybody. He was just playing. He wasn't even harming himself. He was not even doing that. He was just numbing his pain or whatever. And then the off – and then he said put down the driller to Charlie and Charlie said, "Well, what are you going to do? You going to kill me?" And then the officer, which never in my mind ever would think that the officer was going to pull out his gun and shot him right in the chest, one shot, cold blood murder. Boom. Just like that. And I'm like, "Why did you kill him? Why did you kill him? He didn't do anything. He did not deserve that." … Why did he have to shoot him like that? I don't get it. He – Charlie was not doing anything to him at all, at all.

*Id.* 13:5-14:4.

> Q:     From the time that Sergeant Russell stepped up onto the landing, is it accurate to say that all three of your positions remained the same, that Mr. Marshall stayed there at the door – doorway, that you were standing over to the side of the landing and that Russell stayed where he was –
>
> A:     Right.
>
> Q:     -- on the landing?
>
> A:     Right.
>
> Q:     And the thing was that I was closer to Charlie. So whenever he took out the gun, like I could feel the bullet….

*Id.* 15:3-16:15.

While Mrs. Marshall could have more clearly stated that she looked at

Mr. Marshall right before Sgt. Russell shot him and saw him make no movement,

drawing all factual inferences in Plaintiffs' favor as the Court must on summary judgment, her testimony is sufficient to create a fact issue. Her testimony that Mr. Marshall was "not doing anything" and stayed in the same position throughout the incident calls into question Sgt. Russell's statement that Mr. Marshall "raised the drill and moved quickly towards" him, closing a distance of four feet. There is evidence, if believed, that Sgt. Russell shot Mr. Marshall while he stood motionless with the drill in hand; that he made no threatening movement toward the officer; and that he posed no threat to anyone else at the time he was shot.[6] Under Plaintiffs' version of the facts, while Mr. Marshall did not comply with commands to put down the drill, he was not actively resisting any arrest or attempting to flee. The undisputed fact that the shooting unfolded within two minutes also weighs against a finding of reasonableness. *Trammell*, 868 F.3d at 342 ("a reasonable jury could find that the degree of force used was not justified where the officer 'engaged in very little, if any, negotiation' with the suspect and 'instead quickly resorted to' force") (quoting *Newman v. Guedry*, 703 F.3d 757,

---

[6] *See Bacque v. Leger*, 207 F. App'x 374, 376 (5th Cir. 2006) (denying qualified immunity to officer who shot individual who—resolving all factual inferences in favor of the non-moving party—"stood motionless with his knife at his side," that the officer stood several feet away from the suspect, and the suspect "was not threatening anyone at this time").

763 (5th Cir. 2012)). The combination of these facts creates a genuine dispute as to how a reasonable officer would have responded in this situation.[7]

### c. Sergeant Russell is not entitled to summary judgment on qualified immunity.

For qualified immunity, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Osborne v. Harris Cnty.,* 97 F. Supp. 3d 911, 923 (S.D. Tex. 2015) (quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir. 2009)).

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

---

[7] In addition, Mrs. Marshall testified that the drill did not have a bit attached and even though Mr. Marshall pressed the drill against his arm, it did not penetrate his arm because there was no bit. M. Marshall Dep. 13:5-15:13, ECF No. 57-6. The Court does not find this disputed fact material to the reasonableness inquiry and is not persuaded that the absence of a drill bit renders Mr. Marshall completely unarmed because as Sgt. Russell and his non-retained expert contend, the drill could still be used as a blunt object. ECF No. 59 at 8; Coons Aff. ¶ 26(C)(5), ECF No. 52-3. Moreover, the standard is what an officer in Sgt. Russell's position could have reasonably believed. He did not have to be correct in his perception that the drill bit was attached. The defense of qualified immunity allows for reasonable mistakes of fact. *See Jamison v. City of Shreveport*, No. 15-267, 2016 WL 3920439, at *4 (W.D. La. July 18, 2016).

Mrs. Marshall also testified Sgt. Russell tampered with evidence by placing the drill bit on the drill after the incident. M. Marshall Dep. 4:3-7:6, 5:23-6:11, ECF No. 57-6. Plaintiffs alleged Sgt. Russell's past disciplinary history evidences a propensity to lie, and therefore his version of the facts is not credible. ECF No. 57-5 at 4-6; *see* Ex. G, ECF No. 57-5; Russell Dep. 8:11-9:5, ECF No. 57-8; ECF No. 59 at 6-7. This is a credibility issue that is not for the Court to decide. "In deciding a summary judgment motion, the district court may not make credibility determinations or weigh evidence." *Ware v. United Airlines, Inc.*, No. 4:16-CV-513, 2017 WL 5127166, at *2 (S.D. Tex. Sep. 1, 2017) (citations omitted).

*Griggs v. Brewer*, 841 F.3d 308, 314-15 (5th Cir. 2016) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The Supreme Court rejected a "requirement that previous cases be 'materially similar.'" *Gerhardt v. McLendon*, 714 F. App'x 327, 334 (5th Cir. 2017) (quoting *Hope*, 536 U.S. at 741). "We do not require a case to be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Here, the issue is whether it was clearly established that an officer cannot use deadly force against an individual not suspected of any serious crime who is in his own home standing at a safe distance holding a drill, a weapon other than a firearm, and is not charging or making threatening movements toward the officer. *Reyes v. Bridgwater*, decided in 2010, is instructive. In *Reyes*, the Fifth Circuit reversed the grant of qualified immunity where officers responded to a domestic dispute, the suspect moved into the entryway of his home with a knife, he did not comply with the officers' commands to drop the knife, and then one of the officers shot him. 362 F. App'x at 404-05. The parties disputed what the suspect, Mr. Ceballos, did immediately before he was shot. Officer Bridgwater testified Mr. Ceballos suddenly appeared more aggressive, stepped toward the officers, and raised the knife. *Id*. at 405. The plaintiffs testified he did not step toward the officers or raise the knife. *Id*. at 405.

20

The *Reyes* court found, resolving all inferences in favor of the plaintiffs, "there was no 'act' to justify the shooting." *Id.* at 408. "[T]he focus of the inquiry is 'the act that led [the officer] to discharge his weapon.'" *Id.* at 406. The Fourth Amendment does not allow "an officer to use deadly force against a person not suspected of any serious crime who is in his own home … standing at a safe distance holding a kitchen knife merely because he is holding the knife and does not put it down despite police instruction to do so." *Id.* at 408. "The immediacy of the risk presented by a man armed with a kitchen knife at his side is far less than that of a man armed with a gun: a gun can kill instantaneously at the distance … whereas Ceballos would have had to first either advance toward Bridgwater or at least raise the knife before he could inflict any harm." *Id.* at 407.

While there are several cases in the Fifth Circuit where officers responded to calls involving persons undergoing a mental health crisis and ultimately shot the individual, in which courts granted or affirmed qualified immunity, these cases are distinguishable.[8] In each of these cases, it was either undisputed, or there was no

---

[8] *See Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1135 (5th Cir. 2014) (affirming grant of qualified immunity, where officers responded to 911 call by concerned family members that their father was suicidal, father was sitting in his truck with a gun to his head, he did not comply with commands to put the gun down, he walked toward the officers, and then one of the officers fired his weapon); *Harris v. Serpas*, 745 F.3d 767, 774 (5th Cir. 2014) (affirming grant of qualified immunity, where officers responded to 911 call by wife concerned that her husband attempted to commit suicide, he was armed with a knife, he was getting up out of bed and raising the knife above his head, and then one of the officers fired his weapon); *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011) (affirming grant of summary judgment, where officers responded to 911 call by mother regarding her son who was bi-polar, schizophrenic, and had a history of being

*genuine* dispute of fact that the subject advanced toward the officers with a weapon. *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1135, 1136 (5th Cir. 2014) (it was undisputed that in the moments right before he was shot, Rice was armed and moving toward the officers); *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (video evidence clearly showed "Mr. Harris was standing up out of bed and had raised the knife above his head at the time the shots were fired"), *cert. denied*, 135 S.Ct. 137 (2014); *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (it was undisputed that the shots were fired after Scott charged out of his room with knives in each hand in the direction of the officers), *cert. denied*, 566 U.S. 1009 (2012); *Elizondo v. City of Garland*, No. 3:09-CV-1103, 2010 WL 11515271, at *5 (N.D. Tex. Oct. 18, 2010) ("In the second before the fatal shooting, the undisputed evidence shows Ruddy Elizondo advanced to within striking distance of Officer Green."), *aff'd*, 671 F.3d 506 (5th Cir. 2012), *cert. denied*, 568 U.S. 818 (2012).

Accordingly, assuming Plaintiffs' version of the facts as true, no reasonable officer could have believed that using deadly force against a man not accused of any crime—albeit armed with a blunt object—who was injured and bleeding,

---

suicidal, who had threatened her, was armed with two knives, rushed at the officers with the knives, lacerated one of the officers, and then the officers fired their weapons); *Elizondo v. City of Garland*, No. 3:09-CV-1103, 2010 WL 11515271, at *5 (N.D. Tex. Oct. 18, 2010) (granting qualified immunity where officer responded to 911 call by mother concerned about her son being suicidal, the subject was in his room and armed with a knife, he did not comply with commands to put the knife down, he yelled and cursed at the officer, he was three to five feet away from the officer, he advanced toward the officer, and then the officer fired his weapon).

undergoing a mental health crisis, standing in his own home several feet away, not advancing toward him, and not making threatening movements toward him, violated no constitutional right.[9]

Whether the Decedent advanced toward the officer in a threatening manner immediately before he was shot is material to whether the officer used deadly force in violation of clearly established law. *Compare Harris*, 745 F.3d at 773 ("It is well established that '[t]he excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force.]' … We need not look at any other moment in time.") (internal citations omitted) (emphasis in original), *with Manis v. Lawson*, 585 F.3d 839, 844-45 (5th Cir. 2009) (finding that where the plaintiffs did not dispute the only fact material to whether the officer was justified in using deadly force—whether he furtively reached under the seat of his vehicle as though to retrieve a weapon immediately before being shot—the force used was not

---

[9] At least three other Circuits established a similar principle. *See Connor v. Thompson*, 647 F. App'x 231, 239 (4th Cir. 2016) (affirming denial of qualified immunity where officer used deadly force against suicidal, non-criminal individual who descended two steps inside his home, was holding a knife, but otherwise made no threatening movement toward the officer); *Tenorio v. Pitzer*, 802 F.3d 1160, 1165-66 (10th Cir. 2015) (affirming denial of qualified immunity because law was clearly established that an officer cannot use deadly force against an individual who has a weapon other than a gun, and is not charging at the officer or making threatening movements toward the officer), *cert. denied*, 136 S.Ct. 1657 (2016); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (affirming denial of qualified immunity where there was a dispute of fact over whether suspect wielding a gun pointed the gun toward the officers, or made any other threatening movement, just before they shot him), *cert. denied*, 134 S.Ct. 2695 (2014).

excessive). Therefore, genuine disputes of material facts preclude granting summary judgment on the basis of qualified immunity.

### B. Deliberate Indifference To Decedent's Medical Needs.

Sgt. Russell moved for summary judgment on Plaintiffs' claim for medical indifference to Decedent's medical needs. ECF No. 55 at 33. Plaintiffs contended Sgt. Russell acted with deliberate indifference to Decedent's medical needs by failing to summon a crisis intervention team, failing to follow proper procedures in dealing with persons with mental crises, and instead using unreasonable and excessive force. ECF No. 57 at 10, 16-17; Ex. 1 at 9, 12, ECF No. 52-1.

To prevail on this claim, the "plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference." *Mason*, 806 F.3d at 279. To show deliberate indifference, the plaintiff "must show that the officials 'refused to treat [Mr. Marshall], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (quoting *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

While Plaintiffs did allege Mr. Marshall was visibly bleeding when Sgt. Russell arrived and once Sgt. Russell shot him it would have been obvious that Mr. Marshall needed further medical attention, an officer's obligation to

provide medical care is ordinarily satisfied by calling an ambulance or permitting EMS access to the injured individual. *McIntosh v. Smith*, 690 F. Supp. 2d 515, 529-30 (S.D. Tex. 2010) (finding no deliberate indifference to medical needs of suspect shot by officer, where officer immediately radioed that shots were fired and ambulance arrived shortly thereafter) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-45 (1983) and *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003)); *accord Buchanan v. Gulfport Police Dep't*, No. 1:08-CV-1299, 2012 WL 1906523, at *11-12 (S.D. Miss. May 25, 2012) (same), *aff'd*, 530 F. App'x 307 (5th Cir. 2013).

The undisputed evidence is that the shooting unfolded within two minutes of Sgt. Russell's arrival on scene, and within one minute thereafter, Sgt. Russell notified dispatch shots were fired and called for EMS to move from their staging area to provide medical care. Plaintiffs failed to present evidence creating a genuine dispute of material fact as to Sgt. Russell's subjective knowledge or his indifference. Plaintiffs alleged the shooting itself formed the basis of the deliberate indifference claim. However, Plaintiffs failed to cite any relevant case law where a claim for deliberate indifference was found to exist under similar circumstances, particularly in a situation that unfolded rapidly in under two minutes.

### C. Negligence And Negligent Infliction Of Emotional Distress/Bystander Claims.

In a suit asserting claims under the Texas Tort Claims Act ("TTCA") against both a governmental unit and its employee, the court must dismiss the tort claims against the employees upon motion by the governmental unit. TEX. CIV. P. & REM. CODE § 101.106(e); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008). Furthermore, the Texas Civil Practice and Remedies Code § 101.106(e) requires dismissal of claims against a governmental unit's employee in both his individual and official capacities. *See Texas Bay Cherry Hill, L.P. v. City of Fort Worth*, 257 S.W.3d 379, 401 (Tex. App.–Fort Worth 2008, no pet.); *Perez v. Texas A&M Univ. at Corpus Christi*, No. 2:13–CV–225, 2013 WL 6230353, at *12 (S.D. Tex. Dec. 2, 2013).

Here, Plaintiffs filed suit against both Harris County and Sgt. Russell in his individual and official capacities, alleging tort actions under the TTCA. Harris County requested "that all state law claims [against] Sergeant Ben Russell be dismissed in accordance with Texas Tort Claims Act sections 101.106(a), (e), and (f)." ECF No. 53 at 23-24. Thus, the Texas Civil Practice and Remedies Code § 101.106(e) requires dismissal of Plaintiffs' negligence and negligent infliction of emotional distress-bystander claims against Sgt. Russell.[10]

---

[10] Sgt. Russell also asserted he is entitled to official immunity under state law. ECF No. 55 at 26-28, 34. However, the Court need not address this because the Court recommends dismissal of the state law claims based on the TTCA.

26

**IV.**

**DEFENDANT HARRIS COUNTY'S MOTION FOR SUMMARY JUDGMENT**

**A. Municipal Liability Under 42 U.S.C. § 1983.**

Harris County is a governmental entity and as such is deemed to be a person subject to liability to a suit under § 1983. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978). Harris County's motion for summary judgment asserted that Plaintiffs have no evidence that any constitutional right was violated; that any policy, custom, or practice of Harris County, failure to train, or lack of supervision was the moving force causing any violation; or that Harris County was deliberately indifferent to Decedent's and Plaintiffs' rights. ECF No. 53 at 13, 16.

**1. Policy, Custom, or Practice.**

To establish municipal liability under § 1983, in addition to proving a constitutional right was violated, a plaintiff must prove (1) the existence of an official policy, custom, or practice (2) of which a municipal policymaker can be charged with actual or constructive knowledge (3) that was the moving force causing the constitutional violation. *Holley v. Blomberg*, 142 F. Supp. 3d 517, 522 (S.D. Tex. 2015) (citing *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)); *Salazar-Limon v. City of Houston*, 97 F. Supp. 3d 898, 910 (S.D. Tex. 2015) (citing *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005)). A

27

municipal entity cannot be held liable for a § 1983 claim based solely on a theory of *respondeat superior*. *Tolan v. Cotton*, No. 4:09-CV-1324, 2015 WL 5310801, at *1 (S.D. Tex. Sep. 11, 2015) (quoting *Monell*, 436 U.S. at 691) (emphasis in original).

"In addition, if the policy at issue is not facially unconstitutional, a plaintiff must also show that it was adopted with deliberate indifference…." *Echols*, 2013 WL 6243736, at *10 (quoting *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009)). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a [municipal] actor disregarded a known or obvious consequence of his action." *Tolan*, 2015 WL 5310801, at *2 (quoting *Board of Cnty. Com'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 410 (1997)). "[A] showing of simple or even heightened negligence will not suffice." *Backe v. City of Galveston*, 2 F. Supp. 3d 988, 999 (S.D. Tex. 2014) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

### a. Violation of a constitutional right.

As discussed above, Plaintiffs produced sufficient evidence to create genuine disputes of material fact from which a jury could find Sgt. Russell violated a clearly established constitutional right. *See supra*, section III.A.

### b. Policy, custom, or practice.

Plaintiffs alleged the County maintains the following deficient policies, customs, and/or practices:

- The crisis intervention/mentally disturbed persons, use of force, crisis intervention team, and use of firearms policies "were defective and failed to provide for the health, safety, and welfare of the public and failed to provide reporting measures to ensure police accountability." ECF No. 56 at 10.

- The policies "provided no instruction and penalties to officers" and the policies lack clarity, guidance, and accountability measures. *Id*. at 10-11.

- The policies vested "complete authority to its officers, allowing sole discretion with regard to use of force, and use of excessive force, including the use of force tactics that are not taught by Defendant Harris County and without proper guidance, definitiveness, structure, and/or training to … prevent constitutional torts from occurring." *Id*. at 13.

- A custom and/or practice "permitted its officers to deviate from the inadequate training." *Id*. at 17.

Defendant has met its initial burden to show its policies are not unconstitutional or otherwise deficient. Defendant's retained police practices expert, Jared Zwickey, explained in his affidavit that the HCSO is accredited by, and complies with, standardized policies promulgated by the Commission on Accreditation for Law Enforcement Agencies ("CALEA"), an association of national and international law enforcement agencies. Zwickey Aff. at 52-53, ECF No. 52-4. The HCSO also "has policies and procedures in place that are accepted as nationally accepted standards for the administration and operation of a professional law enforcement agency." *Id*. at 53.

29

Plaintiffs have not presented evidence showing the policies fall below nationally accepted law enforcement standards, and Plaintiffs' expert, Max Westbrook, has not offered any opinions on whether Harris County maintained unconstitutional policies, customs, or practices. Plaintiffs introduced as evidence the County's written policies at issue. However, these are not facially unconstitutional. *See, e.g.*, *id.* at 54-55. Moreover, to the extent Plaintiffs claim that the County has unwritten customs or practices, they failed to provide sufficient evidence to create a genuine dispute of fact that any such "widespread and persistent" policies, customs, or practices exist. Even assuming they do exist, Plaintiffs failed to prove deliberate indifference, knowledge, and causation.

### c. Deliberate indifference.

Deliberate indifference "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Skinner v. Gragg*, No. 14-1412, 2015 WL 12966224, at *8 (S.D. Tex. Aug. 13, 2015) (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003)), *aff'd*, 650 F. App'x 214 (5th Cir. 2016). "Generally, '[a]llegations of an isolated incident are not sufficient to show the existence of a custom or policy.'" *Brown*, 206 F. Supp. 3d at 1245 (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992)).

Here, the Plaintiffs failed to present evidence of a pattern of excessive force and relied solely on this incident. *See Holley*, 142 F. Supp. 3d at 525-26 (granting

summary judgment as to municipal policy claim because plaintiff failed to present evidence of a pattern of excessive force, and evidence of one prior incident was insufficient); *Villalba v. City of Laredo*, No. 5:14-CV-17, 2015 WL 5038337, at *5-6 (S.D. Tex. Aug. 26, 2015) (same); *cf. Backe*, 2 F. Supp. 3d at 1001 (denying summary judgment as to municipal custom of using excessive force where one incident involved "thirteen alleged victims, twenty alleged perpetrators or accomplices, and forty-nine separate alleged acts of police brutality").

### d. Actual or constructive knowledge.

Plaintiffs did not provide any evidence that the Sheriff at the time[11] had "actual or constructive knowledge of the alleged polic[ies] or himself promulgated these policies."[12] *Holley*, 142 F. Supp. 3d at 522. Plaintiffs only made conclusory allegations that Harris County "was aware that the reckless disregard for human life that Defendant Sergeant Ben Russell displayed was attributable to the instruction, example, or acceptance of Defendant's official policy itself…."

---

[11] "It has long been recognized that, in Texas, the county sheriff is the county's final policy maker in the areas of law enforcement…." *Brown v. U.S. Postal Inspection Serv.*, 206 F. Supp. 3d 1234, 1245 (S.D. Tex. 2016) (citations omitted).

[12] "'Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information,' while 'constructive knowledge 'may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.'" *Id.* (citations omitted).

ECF No. 56 at 15. Plaintiffs' allegations are insufficient to create a genuine dispute of material fact of the Sheriff's knowledge.

### e. Moving force.

Plaintiffs must establish a direct causal link between the policy and the constitutional deprivation. *Echols*, 2013 WL 6243736, at *9 (quotations omitted). Thus, the policy must be the moving force behind the constitutional violation. *Id*. Plaintiffs contended Sgt. Russell did not follow HCSO policies. ECF No. 56 at 12, 14. This is insufficient to prove the policies themselves were the moving force that caused Sgt. Russell to violate a constitutional right. "There is no evidence suggesting that [Sgt. Russell] made that decision for any reason related to any County policy or any understanding thereof which he may have had…." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 310-11 (5th Cir. 2004); *see also Echols*, 2013 WL 6243736, at *10-11 (granting summary judgment as to municipal policy claim where plaintiffs failed to present evidence of causation or that any policymaker had actual knowledge of the alleged custom or practice of allowing excessive force). Thus, Plaintiffs have failed to establish a fact issue with respect to their deficient policy, custom, or practice claim, and Harris County is entitled to summary judgment on this claim.

### 2.  Failure to Train.

Plaintiffs alleged the County inadequately trained its deputies regarding crisis intervention and the use of force. ECF No. 56 at 10. To prevail on a claim against a municipal entity based on the failure to train, in addition to proving a constitutional violation, the plaintiff must prove (1) the municipal entity inadequately trained its officers, (2) the inadequate training was the moving force that caused the constitutional violation, and (3) the failure to train amounted to deliberate indifference. *Backe*, 2 F. Supp. 3d at 1007 (citing *Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010)).

#### a. Inadequate training.

In the Fifth Circuit, "[a]lthough not dispositive, compliance with state requirements is 'a factor counseling against a 'failure to train' finding.'" *Id*. at 1008. Based on affidavits of Sgt. Russell, Mr. Zwickey, and Defendants' non-retained expert, Jay Coons, the County has met its initial burden to show Sgt. Russell's training was adequate and complied with state standards. To be licensed and employed as a peace officer in Texas, all officers must be licensed with the Texas Commission on Law Enforcement ("TCOLE") and complete a six month Basic Peace Officer training. Coons Aff. ¶ 23-24, ECF No. 52-3; Zwickey Aff. at 51, ECF No. 52-4. Sgt. Russell complied with these requirements. Russell Aff. ¶ 2, ECF No. 52-2; Coons Aff. ¶ 23-24, ECF No. 52-3. He holds "various

TCOLE certifications: Basic Peace Officer; Intermediate Peace Officer; Advanced Peace Officer; and Master Peace Officer," and also completed Temporary Patrol Deputy training at the Harris County Sheriff's Academy. Russell Aff. ¶ 2, ECF No. 52-2.

In addition, the HCSO requires all officers to complete forty hours of continuing training every two years, *id.* ¶ 2; Zwickey Aff. at 51, ECF No. 52-4, and its use of force policy requires annual training on the use of force, Zwickey Aff. at 51, ECF No. 52-4; Ex. B at 17, ECF No. 57-2. In accordance with these requirements, Sgt. Russell completed over 2,500 hours of training since he was hired in 2000. Russell Aff. ¶ 2, ECF No. 52-2; Zwickey Aff. at 51, ECF No. 52-4. He received TCOLE-approved advanced training, including on topics of patrol/tactical training, suicide prevention and crisis intervention, Tasers, use of force, arrest, search and seizure, "Effective Leadership and Leadership Training," and "New Supervisor's" training. Coons Aff. ¶ 23-24, ECF No. 52-3. Both Mr. Coons and Mr. Zwickey offered opinions that Sgt. Russell was adequately trained and his training is consistent with TCOLE requirements and standard law enforcement training practices across the United States. *Id.* ¶¶ 23-24; Zwickey Aff. at 50, 57, ECF No. 52-4.

In response, Plaintiffs' expert offered opinions that Sgt. Russell failed to follow his training, and suggests the County could re-emphasize certain training

and place greater emphasis on de-escalation techniques. Westbrook Rep. at 11-18, 22-24, ECF No. 57-5. While these opinions certainly demonstrate that HCSO's training could be improved, this fails to show Sgt. Russell was *not* trained, the training falls below what is required under state law, or that the training required under state law itself is deficient. *See Holley*, 142 F. Supp. 3d at 527-28 (granting summary judgment as to failure to train claim where officers' training complied with state requirements); *accord Villalba*, 2015 WL 5038337, at *3 ("[W]hen officers have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate.") (quoting *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381-82 (5th Cir. 2010)). Even assuming the training was inadequate, Plaintiffs failed to prove the moving force and deliberate indifference elements.

### b. *Moving force.*

Although Plaintiffs and their expert argued that Sgt. Russell departed from his training or that training could be improved, this does not necessarily prove that the County failed to adequately train him and other deputies such that it caused Sgt. Russell to violate a constitutional right. *See Backe*, 2 F. Supp. 3d at 1007-08 (granting summary judgment regarding failure to train claim because assertions regarding the need for better or more training are insufficient, and evidence

35

showed that officers complied with TCOLE requirements). Plaintiffs' evidence is too tenuous to prove causation.

### c. Deliberate indifference.

"To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations…." *Trammell*, 868 F.3d at 345 (quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005)); *accord Roten v. City of Minden*, No. 16-381, 2017 WL 1398655, at *8 (W.D. La. Apr. 18, 2017) (quoting *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000)) ("[P]roof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.").

> 'If a [training] program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for' … and '[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'

*Boyd v. City of Houston, Tex.*, 548 F. App'x 100, 103-04 (5th Cir. 2013) (quoting *Bryan Cnty.*, 520 U.S. at 407). Here, Plaintiffs only relied on this one incident and did not present evidence of a pattern of excessive force. Plaintiffs made conclusory allegations that "[t]he disputed evidence shows a pattern of same or similar conduct, including the use of excessive force by Defendant Sergeant Ben Russell and credibility issues….[,]" but conclusory allegations are insufficient to create a genuine dispute of material fact. ECF No. 56 at 3.

While the Supreme Court left open the possibility that in narrow circumstances, "a single violation … could trigger municipal liability," *Connick v. Thompson*, 563 U.S. 51, 107 n. 24 (2011) (citing *Bryan Cnty.*, 520 U.S. at 409), "a plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation," *Echols*, 2013 WL 6243736, at *13 (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2007)). The Supreme Court explained this exception by way of example:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force … can be said to be 'so obvious,' that the failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

*Cardenas v. Lee Cnty.*, 569 F. App'x 252, 257-58 (5th Cir. 2014) (quoting *Canton*, 489 U.S. at 390 n.10).

Here, there is no evidence that HCSO deputies received *no* training on the use of deadly force or crisis intervention, or that the training was so deficient the County can be said to have ignored an obvious risk that its deputies would use excessive force. *See, e.g., Brown v. Bryan Cnty.,* 219 F.3d 450, 462 (5th Cir. 2000) (affirming denial of motion for judgment as a matter of law on failure to train claim where evidence showed the County provided no training to its officers and had no policies regarding the supervision of junior officers), *reh'g denied*, 235

37

F.3d 944 (5th Cir. 2000), *cert. denied*, 532 U.S. 1007 (2001). In addition, Plaintiffs have not shown this case falls within the narrow single-incident exception. *See Echols*, 2013 WL 6243736, at *14 (granting summary judgment as to failure to train claim under single incident exception where officers' training complied with state standards, evidence showed officers received training on use of force and deadly force, and insufficient training in one limited area was insufficient to prove a failure to train). Thus, Plaintiffs have failed to establish a fact issue exists with respect to their inadequate training claim, and Harris County is entitled to summary judgment on this claim.

### 3.  Failure to supervise.

A § 1983 claim for municipal liability based on failure to supervise is evaluated in the same way as a claim based on failure to train. *Trammell*, 868 F.3d at 344. Plaintiffs alleged a lack of supervision based on the County's failure to terminate Sgt. Russell following his prior misconduct and failing to discipline him for this incident. ECF No. 56 at 4-9, 13, 19-20.

#### a. Inadequate supervision.

Defendant has met its initial burden to show it properly supervised Sgt. Russell and other deputies. The HCSO's use of force policy provides that each use of force is evaluated at various levels, including the Sheriff's Office of Inspector General. Ex. B at 10-16, ECF No. 57-2; Coons Aff. ¶ 29(A),

ECF No. 52-3. Defendant's expert, Mr. Coons, stated that Sgt. Russell was involved in 22 uses of force in a six year period, and "[e]ach of [those] reports was reviewed at several levels above [Sgt. Russell] and his actions were found justified in each and every instance." Coons Aff. ¶ 29(B), ECF No. 52-3. Based on the nature of Sgt. Russell's work during that time in the jail, where use of force is more frequently necessary, Mr. Coons was not surprised that Sgt. Russell had prior encounters involving the use of force. *Id.*

Plaintiffs have not provided evidence that Sgt. Russell or other deputies previously or repeatedly used *excessive* force. *See Echols*, 2013 WL 6243736, at *14 (granting summary judgment as to municipal liability where prior complaints of excessive force were justified, not sustained, unfounded, or never formalized, and involved conduct other than a lethal shooting). This single incident is insufficient to establish that the HCSO has an unwritten practice of never finding uses of force excessive to cover up excessive force or that other inadequate supervision exists.

### b.  *Deliberate indifference.*

Deliberate indifference typically requires "[p]roof of more than a single instance of the lack of … supervision causing a violation of constitutional rights…." *Holley*, 142 F. Supp. 3d at 526 (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)). Again, Plaintiffs relied solely on this case and

39

failed to show a pattern. *See Holley*, 142 F. Supp. 3d at 529 (granting summary judgment as to failure to supervise claim because plaintiff failed to present evidence of a pattern of similar violations); *accord Villalba*, 2015 WL 5038337, at *5 (same). Thus, Plaintiffs failed to show that any failure to supervise amounted to deliberate indifference. *Echols*, 2013 WL 6243736, at *12.

Under the single incident exception, to find the requisite culpability on behalf of the municipality, the excessive force must have been a "highly predictable consequence" of the decision not to terminate or otherwise supervise Sgt. Russell following his prior misconduct, and based on that misconduct, it must have been highly likely that Sgt. Russell would engage in excessive force in violation of the Fourth Amendment. *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 662 (N.D. Tex. 2018) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009)). Plaintiffs have no evidence sufficient to meet this standard.

Sgt. Russell's prior discipline arose because he used a racist slur and then lied about it. Plaintiffs' expert failed to establish Sgt. Russell's prior conduct would foretell use of force. Instead, Plaintiffs' expert cursorily stated that "[i]n a number of police departments lying to an internal affairs investigator is an automatic firing or indefinite suspension," Westbrook Rep. at 19, ECF No. 57-5, and recommended "[p]olice administrators should follow up with previously suspended officers (deputies) and certainly the actions leading to a five day

40

suspension (in this case – lying) should be addressed in the performance evaluation[,]" *id.* at 20. Plaintiffs' expert's opinion is not sufficient to establish that the decision not to terminate Sgt. Russell "reflected conscious disregard of an obvious risk that a use of excessive force would follow." *Bryan Cnty.*, 520 U.S. at 415.

The undisputed evidence is that this is the first time Sgt. Russell has ever shot anyone. Russell Aff. ¶ 15, ECF No. 52-2. Although he was investigated for use of force previously, there is no evidence in the record that any other complaints of excessive force were ever made against him, or that he was ever charged or convicted of crimes involving violence. He has never been a defendant before. *Id.* Thus, there is no evidence indicating that Sgt. Russell's prior behavior would have predicted the shooting in this instance.

### c. *Moving force.*

Since Plaintiffs fail to prove the County inadequately supervised its deputies with deliberate indifference, Plaintiffs also cannot prove that any inadequate supervision caused the injury, *i.e.*, the moving force element.

### B. Negligence.

In Texas, a governmental unit is immune from tort liability unless the legislature has waived immunity or the governmental unit has consented to suit. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004)

(consent to suit); *Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex. 1998) (legislative waiver). Absent express waiver or consent, Harris County is immune from suit. *See* TEX. CIV. P. & REM. CODE § 101.001(3)(B) (defining governmental unit to include a county); *Miranda*, 133 S.W.3d at 224–25.

Texas has not waived its official immunity to actions alleging an intentional tort against a governmental unit, TEX. CIV. P. & REM. CODE § 101.057, and it has not consented to any such action here. Regardless of which tort plaintiffs choose to plead, if they plead a claim "arising out of assault … or any other intentional tort," the governmental unit may properly assert official immunity. *Id.* at § 101.057(2); *see also Harris Cnty. v. Cabazos*, 177 S.W.3d 105, 112 (Tex. App.–Houston [1st Dist.] 2005, no pet.); *McCord v. Mem. Med. Ctr. Hosp.*, 750 S.W.2d 362, 364 (Tex. App.–Corpus Christi 1980, writ ref'd n.r.e.).

In the operative complaint, Plaintiffs allege negligence based on (1) Sgt. Russell's "negligent, willful, wanton, and reckless [acts and omissions] in exhibiting a conscious disregard for" and deliberate indifference to Mr. Marshall's safety, Ex. 1 at ¶¶ 5.32-5.35, ECF No. 52-1; (2) Harris County's "inadequate[] training on the procedures for recognition, supervision, handling and responding to suicidal victims," *id.* at ¶ 5.33; and (3) the county's failure to provide adequate medical care to Mr. Marshall, *id.* at ¶ 5.36. With respect to points (2) and (3),

Plaintiffs have produced no evidence in support of their allegations. All other allegations under Count IV arise out of a claim that Sgt. Russell assaulted Mr. Marshall.[13] Here, Plaintiffs did not expressly allege that Sgt. Russell acted intentionally when he shot Mr. Marshall. Instead, Plaintiffs described Sgt. Russell's actions using action verbs in the negative ("Russell decided not to follow" Harris County's Use of Force Policy, *id*. at ¶ 4.28; "Russell decided not to wait for a second deputy," *id*. at ¶ 4.29; Russell "failed to de-escalate the situation," *id*. at ¶ 4.30; among others). But Plaintiff's artful pleading does not change the fact that, just as in *Harris County v. Cabazos*, "the gravamen of [the] claim is that a Harris County [Sergeant] wrongfully shot" Marshall. 177 S.W.3d at 111-12; *see* Ex. 1 at ¶¶ 4.26-4.27, 4.37-4.39, 5.30-5.42, 6.1-6.3, ECF No. 52-1. Such allegations amount to a claim of assault, and therefore, Harris County retains official immunity.

## V.
## CONCLUSION

The Court recommends that:

- Defendant Ben Russell's motion for summary judgment should be **GRANTED in part** as to Plaintiffs' claim for deliberate indifference

---

[13] Texas defines assault as "(1) intentionally, knowingly, or recklessly caus[ing] bodily injury to another, including the person's spouse; (2) intentionally or knowingly threaten[ing] another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly caus[ing] physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." Tex. Penal Code Ann. § 22.01(a); *Forbes v. Lanzl*, 9 S.W.3d 895, 899 (Tex. App.–Austin 2000, pet. denied) (definition of assault the same for criminal prosecution and tort liability).

to Decedent's medical needs and as to Plaintiffs' state law claims. The motion should be **DENIED in part** as to Plaintiffs' claim for excessive force under the Fourth Amendment and as to qualified immunity.

- Defendant Harris County's motion for summary judgment should be **GRANTED**.

**The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude review of factual findings or legal conclusions, except for plain error.** *Quinn v. Guerrero*, **863 F.3d 353, 358 (5th Cir. 2017).**

Signed at Houston, Texas, on August 28, 2018.

Dena Palermo
_____
Dena Hanovice Palermo
United States Magistrate Judge